1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   NICOLAS F. BROSSELIN,                    CASE NO. C11-1853MJP

11                      Petitioner,           FINDINGS OF FACT AND
                                              CONCLUSIONS OF LAW
12          v.                                REGARDING APPLICATION OF
                                              HAGUE CONVENTION
13   SHANNON M. HARLESS,

14                      Respondent.

15

16          This matter comes before the Court on Nicolas F. Brosselin's petition for the return of his

17   child. (Dkt. No. 1.)  The Court has requested briefing from the parties on whether the Hague

18   Convention properly applies to the petition, and held a two-day evidentiary hearing on the issue

19   on December 5 and 6, 2011.  Having reviewed the briefs (Dkt. Nos. 14, 15, 26, 27), and heard

20   testimony as well as argument, the Court finds that the Convention does not apply.  The Court

21   therefore DISMISSES the petition for lack of jurisdiction.

22                                    **Background**

23          Invoking the Hague Convention, Petitioner Brosselin has requested the Court issue an

24   order compelling the return of Petitioner's and Respondent Shannon Harless's son, LT, to

1  France.  A petition for return of a child under the Hague Convention on the Civil Aspects of

2  International Child Abduction Article 3(a) may proceed in this Court only where the child is

3  taken from his habitual residence outside of the United States.  See Holder v. Holder, 392 F.3d

4  1009, 1014 (9th Cir. 2004).  Respondent has argued from her first appearance that she does not

5  believe the Hague Convention applies because her son's habitual residence is Oak Harbor,

6  Washington, not France.  (See Dkt. No. 9 at 1-2.)  To resolve this initial matter, the Court

7  requested briefing and held a two-day evidentiary hearing to resolve the issue of LT's habitual

8  residence.  The Court did not undertake any inquiry into the ultimate issue of whether LT had

9  been wrongfully removed.  The evidentiary hearing was limited to the issue of habitual

10  residence, though many of the issues discussed went beyond that issue.

11       Habitual residence is a term of art that the Hague Convention has left intentionally

12  undefined to permit flexibility in its application.  See Holder, 392 F.3d at 1015.  The Ninth

13  Circuit has counseled that the habitual residence of an infant is determined by examining the

14  parents' mutual, settled intent to move to a new country for a sufficiently "appreciable period of

15  time" for the infant to acclimatize to the new country of residence.  See id.  Petitioner has the

16  burden to prove habitual residence by a preponderance of the evidence.

17       In reaching its decision, the Court has accepted into evidence and reviewed the

18  declarations submitted by both Petitioner and Respondent as well as the exhibits admitted into

19  evidence at the hearing.  The Court applied the Federal Rules of Evidence, while heading the

20  Hague Convention's admonishment that authenticity of documents submitted with the petition is

21  not required.  42 U.S.C. § 11605.  This is consistent with the approach of several circuit courts,

22  though the issue remains unresolved in the Ninth Circuit.  See Danaipour v. McLarey, 386 F.3d

23

24

FINDINGS OF FACT AND CONCLUSIONS OF
LAW REGARDING APPLICATION OF HAGUE
CONVENTION- 2

1  289, 296 (1st Cir. 2004); <u>Karkkainen v. Kovalchuk</u>, 445 F.3d 280, 285 (3d Cir. 2006); <u>Avendano</u>

2  <u>v. Smith</u>, No. Civ. 11-0556 JB/CG, 2011 WL 353330, at *1 (D.N.M. Aug. 1, 2011).

3  **Findings of Fact**

4      1.      Petitioner Nicolas Brosselin is a citizen and resident of France.  He is a captain in

5  the French Army and a helicopter pilot.

6      2.      Respondent Shannon Harless is a citizen of the United States of America and a

7  legal permanent resident of France.  She has held a variety of jobs in France and the United

8  States, ranging from teaching English and French to teaching horseback riding lessons.

9      3.      Harless and Brosselin met in 2007 in France and began living together in France

10 in May 2008.

11     4.      Harless became pregnant in January 2009 with a child conceived with Brosselin

12 in France.  The two were not and have not been married.

13     5.      Harless resided in France with Brosselin until April 2009, when she moved to

14 Oak Harbor, Washington, and began residing with her mother.

15     6.      Harless gave birth to LT in October 2009 in Oak Harbor, Washington.  Brosselin

16 was present at the birth.  At the time, Harless received state-assisted health care for her and her

17 son.  LT has both French and American citizenship.

18     7.      Brosselin returned to France after the birth and organized the purchase of a new

19 home.  Emails sent by Harless to Brosselin in November, 2009, shows the house was intended to

20 be shared by Harless, Brosselin, and their son.  (Dkt. No. 17 at 19-22.)

21     8.      In December, 2009, Harless and LT travelled to France and stayed with Brosselin

22 until February 6, 2010.

23

24

FINDINGS OF FACT AND CONCLUSIONS OF
LAW REGARDING APPLICATION OF HAGUE
CONVENTION- 3

1    9.      On February 6, 2010, Harless and LT travelled back to Oak Harbor, Washington,

2  and returned to Harless's mother's home.  Harless held a variety of jobs during her residence in

3  Washington in 2010.

4    10.     In April, 2010, Harless informed Brosselin that she had become engaged to Troy

5  Williams in Oak Harbor.  Harless did not return to France, although she had a return flight to

6  France scheduled for April 17, 2010.  Although the parties dispute whether Harless intended to

7  move back to France, it is clear the relationship between Harless and Brosselin became fractured

8  by this point in 2010.

9    11.     Brosselin traveled to Oak Harbor, Washington to visit LT and Harless in June

10  2010 for ten days.  Brosselin's parents also visited LT and Harless in August 2010.

11    12.     Brosselin made a second trip in October 2010, at which point he proposed

12  marriage to Harless.  During this trip Brosselin appears to have prompted Harless to consider

13  reconnecting with Brosselin in France, but only equivocally.  (See Ex. 51.)

14    13.     In November, 2010, Harless suffered a severe injury from a horse and spent

15  multiple days in the Harborview Hospital in Seattle.  During her recuperation, she continued to

16  reconnect with Brosselin.

17    14.     At some point in January 2011, Harless and Brosselin agreed that Harless and LT

18  would travel to France.  On February 2, 2011, Brosselin purchased a round-trip ticket for Harless

19  and LT for travel from February 17, 2011 to May 10, 2011.

20    15.     Harless testified that she was traveling to France to see if she and Brosselin could

21  get along.  Brosselin testified that Harless was returning to stay in France permanently.

22

23

24

FINDINGS OF FACT AND CONCLUSIONS OF
LAW REGARDING APPLICATION OF HAGUE
CONVENTION- 4

1   16.   Amy Gumbel, another friend of Harless, spoke to Harless prior to the February

2   17, 2011 departure, and Harless stated that she was leaving to go back to France for a little while.

3   (Ex. 118.)  Harless told Gumbel it was not intended to be an indefinite stay.  (Id.)

4   17.   Harless wrote an email to Brosselin on February 12, 2011, explaining that she

5   believed LT needed more stability than she could offer and that she was "scared and tired."

6   (Dkt. No. 17 at 65.)  She wrote that she was "ready to start again," but that she wanted Brosselin

7   to "[c]all me, tell me that it's going to be ok…help me know that I am coming home..not leaving

8   it."  (Id. at 65-66 (as punctuated in original).)

9   18.   In February 17, 2011, Harless travelled to France with LT with four suitcases.

10  She brought clothing and some toys for LT, as well as her own clothes and her horse riding

11  saddle.  She did not ship any boxes or move any furniture.  She left furniture, baby items, and

12  clothing in her mother's home in Oak Harbor, although she did not possess much.

13  19.   Upon her return to France with LT, took up residence with Brosselin.  Although

14  LT had his own bedroom, Harless did not consistently share a room with Brosselin.

15  20.   On March 6, 2011, Brosselin left on a 3-week Army mission to Libya.  During

16  their son's absence, Brosselin's parents visited Harless and LT.  In this same time frame, Harless

17  wrote to Brosselin: "It's poop to yell all the time…lets [sic] just talk about happy things and not

18  get into it.  I'll settle things down in my own mind and heart."  (Dkt. No. 17 at 61.)

19  21.   At some point in March, 2011, Harless discovered that Brosselin had become

20  romantically involved with another woman in Ireland, who has been identified as Pauline.

21  Brosselin admits to having traveled to Ireland to be with Pauline for one weekend prior to

22  Harless's arrival in February 2011.  He denied any further contact at the hearing, but email

23  records show he had substantial correspondence with Pauline.

24

FINDINGS OF FACT AND CONCLUSIONS OF
LAW REGARDING APPLICATION OF HAGUE
CONVENTION- 5

1    22.    Emails between Brosselin and Pauline from March 7, 2011 through March 13,

2  2011, reveal a significant romantic relationship had developed.  On March 9, 2011, Brosselin

3  wrote to Pauline: "I absolutely did not expect to see Shannon burst back into my life with LT

4  under her arm, settle into the house for an undetermined period of time and start to blackmail me

5  in order to be the only woman in my life." (Ex. 112 at 5 (translation of Ex. 108).)  He wrote

6  further, "I thought all was over, that I was going to be able to make a new start at a nice quiet life

7  with you at my side and afterward find a way to get my son back." (Id.)  He concluded, "I

8  deeply hope at the bottom of my heart that things can be resolved and bring us [he and Pauline]

9  back to each other." (Id.)

10    23.    In a second email to Pauline, sent on March 9, 2011, Brosselin wrote

11  "I don't really know what Shannon wants for the long term .. to stay in France, or make my life

12  so impossible that I put her on the plane with a big maintenance allowance every month and

13  guarantee her that I won't try to take LT away from her." (Ex. 112 at 2 (punctuation as in

14  original).)

15    24.    Brosselin also discovered that Harless continued her romantic relationship with

16  Williams.  Brosselin included screen captures of one online sexual encounter between Harless

17  and Williams.  A postcard sent by Harless to Williams dated March 5, 2011, includes Harless's

18  protestation of love for Williams and her desire to return to him. (Ex. 106.)

19    25.    In or around March 18, 2011, Harless's friend Margaret Sara Celik visited Harless

20  and LT in France.  She testified that Harless was living out her suitcase and had not settled in the

21  home.

22    26.    On April 1, 2011, Harless renewed her French business license and contacted the

23  Mayor of Bras sur Meuse, France, to set up a work opportunity.  Harless also gave some English

24

FINDINGS OF FACT AND CONCLUSIONS OF
LAW REGARDING APPLICATION OF HAGUE
CONVENTION- 6

1  teaching lessons.  Harless also signed up for a one-year membership at a horse riding facility.

2  (Dkt. No. 17 at 70.)  Harless also obtained medical insurance coverage with the aid of Brosselin

3  in March.

4       27.     From March 1 through April 30, 2011, LT received in-home babysitting care and

5  also spent time in daycare.  (Dkt. No. 24 at 13-14.)

6       28.     After his return from his mission, on April 10, 2011, Brosselin called the police to

7  intervene in a domestic dispute.  He also called his parents for assistance.

8       29.     At some point around April 20, 2011, Brosselin had his attorney draft a parenting

9  plan with regard to LT.  Harless has presented what she claims to be the parenting plan.  (Ex.

10  109.)  Brosselin disputes its authenticity and the Court finds that it lacks any indicia of

11  authenticity.  It simply a typed up document with no marks of having been drafted by an

12  attorney.  It also includes misspelling of Brosselin's name.  Although the rules of authenticity are

13  relaxed in Hague Convention case, the Court places no weight on the contents of the parenting

14  plan exhibit Harless provided.

15       30.     On May 2, 2011, Harless filed a complaint with the French police that she had

16  been psychologically abused by Brosselin.

17       31.     On May 3, 2011, Harless took LT from France to Luxemburg and flew back to

18  the United States on a new ticket purchased by her mother.

19       32.     Brosselin attempted to contact Harless and LT in the United States, but his phone

20  calls and emails have been largely unanswered.  Brosselin demanded the return of his child.

21  Harless has not made LT available to his father on any consistent basis.

22       33.     Brosselin commenced this lawsuit on November 7, 2011.

23

24

FINDINGS OF FACT AND CONCLUSIONS OF
LAW REGARDING APPLICATION OF HAGUE
CONVENTION- 7

1       34.    In weighing the credibility of the parties, the Court found Brosselin's testimony

2   overall was more credible than Harless's.  However, in examining the testimony about the

3   parties' mutual intent to move LT permanently to France, the Court found neither one to be

4   particularly credible.  Harless was frequently unable to provide clear answers to simple

5   questions, and consistently went beyond the scope of questioning in rationalizing past

6   contradictory statements.  Some of her testimony was also contradicted by emails she had

7   authored contemporaneous to events she described to the Court.  Brosselin, too, appeared to

8   contradict his prior statements made in emails from March of this year, which undermined some

9   of his credibility as to whether he intended to have Harless and LT remain with him indefinitely.

10  Ultimately the parties' testimony shows that neither shared a mutual intent to have Harless and

11  LT settle in France indefinitely, a fact that the other evidence in the record confirms.  See

12  Holder, 392 F.3d at 1017 ("[W]hen the parents no longer agree on the where the children's

13  habitual residence has been fixed, we must look beyond the representations of the parties and

14  consider 'all available evidence." (quotation omitted)).

### Conclusions of Law

16  A.    Standard

17      As explained above, the Court's analysis is limited to the question of whether LT's

18  habitual residence changed from Oak Harbor, Washington to France.  The Court must answer the

19  question of whether LT's parents shared a settled intent to move LT to France, and that he stayed

20  there for a sufficiently "appreciable period of time" for him to acclimatize to the new country of

21  residence.  See Holder, 392 F.3d at 1015.  Petitioner bears the burden to make this showing by a

22  preponderance.  The Court examines the issue of settled intent before turning to the

23  acclimatization of the child.

24

FINDINGS OF FACT AND CONCLUSIONS OF
LAW REGARDING APPLICATION OF HAGUE
CONVENTION- 8

1  B.        Settled Intent

2         Petitioner must show first that he and Harless shared a settled intent to have LT abandon

3  his residence in Oak Harbor, Washington.  Holder, 392 F.3d at 1015.  There is no rigid definition

4  of "settled intent," although the Court is instructed to examine the mutual intent of the parents at

5  the time of the translocation and shortly thereafter.  Id. at 1017; Papakosmas v. Papakosmas, 483

6  F.3d 617, 622 (9th Cir. 2007).   The parties and the Ninth Circuit agree that when the child

7  involved is a young infant, "we look to the subjective intent of the parents, not the children."

8  Hodler, 392 F.3d at 1016.  Where the "parents no longer agree on where the children's habitual

9  residence has been fixed, we must look beyond the representations of the parties and consider

10  'all available evidence.'"  Id. at 1017 (quoting Mozes v. Mozes, 329 F.3d 1067, 1076 (9th Cir.

11  2004)).

12         There are no bright line rules as to when habitual residence changes.  Rather, a flexible

13  application of the law to the unique facts of every case has created a continuum.  On the one end

14  of the spectrum are cases where "the court finds that the family as a unit has manifested a settled

15  purpose to change habitual residence, despite the fact that one parent may have had qualms about

16  the move."  Mozes, 239 F.3d at 1076.  This occurs where "both parents and the child translocate

17  together under circumstances suggesting that they intend to make their home in the new

18  country."  Id. at 1076-77.  The Court will usually find abandonment of the habitual residence in

19  favor of the new country, even if one parent's reservations about the move stand in the way of

20  settled intent.  Id. at 1077.  On the other end of the continuum "are cases where the child's initial

21  translocation from an established habitual residence was clearly intended to be of a specific,

22  delimited period."  Id.  The present dispute before the Court falls somewhere in between these

23  cases, though clearly closer to the latter.

24

FINDINGS OF FACT AND CONCLUSIONS OF
LAW REGARDING APPLICATION OF HAGUE
CONVENTION- 9

1      In some regards, the case is similar to Papakosmas, where the Court found a family's

2  relocation from California to Greece did not result in the changed habitual residence of the two

3  children in part because the parents did not appear to share a mutual intent to relocate

4  permanently to Greece.  438 F.3d 617.  The court found the four-month move was conditional

5  where the evidence showed the husband was selling the couple's American property without his

6  wife's knowledge, the parents lacked employment in Greece, the husband had an affair in

7  Greece, and the couple continued to operate an American business.  Id. at 626.  The case differs

8  to the extent that both husband and wife moved together, but it shares common elements of

9  deception between the parents as evidence lack of settled intent.

10      A Fourth Circuit case, Maxwell v. Maxwell, is hauntingly similar to the present case, and

11  worth an in-depth examination.  588 F.3d 245 (4th Cir. 2009).  Kristina and Andrew Maxwell

12  were married in 1999 in Australia and then quickly moved to Massachusetts.  Id. at 247.  In

13  January 2004, Kristina gave birth to quadruplets, but she and Andrew became estranged by

14  December, 2005.  Id.  Andrew moved back to Australia in 2005, while Kristina moved to North

15  Carolina and filed for divorce in 2006.  Id.  In 2007, the couple decided to reconcile their

16  marriage, although Kristina was concerned Andrew was using the couple's reconciliation to gain

17  custody of the children.  Id.  Both Kristina and Andrew agreed to leave their current significant

18  others, although both shared doubts as to whether either had actually done so.  Id.  Kristina then

19  undertook to move the family to Australia by obtaining travel documents, helping Andrew look

20  for a house and buy a van, and inquiring as to work opportunities in Australia.  Id. at 247-48.

21  She also told friends her move was permanent.  Id. at 248.  Before leaving the United States,

22  Kristina began to suspect Andrew was still dating someone else and her doubts about the

23  reconciliation caused her to continue to lease and insure her car, maintain a cell phone and bank

24

FINDINGS OF FACT AND CONCLUSIONS OF
LAW REGARDING APPLICATION OF HAGUE
CONVENTION- 10

1   account, and continue her medical insurance in the United States.  Id.  Within two weeks of

2   Kristina's arrival in Australia, the relationship between Andrew and Kristina broke down, and

3   Andrew confiscated the children's passports and made several nefarious attempts at stopping

4   Kristina from leaving or obtaining legal assistance.  Realizing she could not leave immediately,

5   Kristina sought permanent residence for herself and her daughter of another marriage, and

6   ultimately obtained new passports from the U.S. Embassy without Andrew's consent.  Id. at 249.

7   Kristina fled to the United States with the children and Andrew filed a petition for wrongful

8   removal in the United States.  Id.

9        The district court and the Fourth Circuit in Maxwell agreed that Kristina and the

10  children's move to Australia was conditional and experimental, and not a change in habitual

11  residence.  Id. at 251.  The courts held that there was an absence in parental shared intent to

12  move the children to Australia indefinitely particularly where the parties provided conflicting

13  testimony.  Id. at 251-52.  Looking beyond representations of the parties, the Fourth Circuit

14  found a lack of settled intent in the absence of marital stability, the retention of ties to the United

15  States, and the lack of stability in the home environment.  Id. at 252-53.  The Court finds these

16  factors relevant to the present dispute and the decision in Maxwell instructive.

17       Brosselin has been unable to show that he and Harless possessed a settled intent to move

18  to France indefinitely.  It is clear that at some point in January 2011, Harless and Brosselin

19  agreed that Harless would travel to France with LT.  While Brosselin maintains that the stay was

20  to be indefinite, the record appears otherwise.  Harless's intentions as to where to reside seem in

21  constant flux.  Upon her return to Oak Harbor in 2010, she quickly became engaged to Williams

22  and lived either with her mother or Williams.  She appears only to have reconnected with

23  Brosselin in November 2010, at a time that she appears to have still been engaged with Williams.

24

FINDINGS OF FACT AND CONCLUSIONS OF
LAW REGARDING APPLICATION OF HAGUE
CONVENTION- 11

1  Central to Harless's lack of settled intent is an email she wrote to Brosselin on February 12,

2  2011, five days before her departure.  The email captures quite clearly the tentative intent of her

3  trip: "[c]all me, tell me that it's going to be ok…help me know that I am coming home..not

4  leaving it." (Dkt. No. 17 at 65-66 (as punctuated in original).)  In addition to the unsettled nature

5  of her relationship with Brosselin and Williams, and the ties she left in Washington, this email

6  shows that Harless's return trip was more an experiment than a commitment to stay in France.

7  Brosselin's testimony at the hearing that Harless was moving for an indefinite period is also

8  undermined by emails he wrote to Pauline on March 9, 2011.  He told Pauline that he "absolutely

9  did not expect to see Shannon burst back into my life with LT under her arm, [and] settle into the

10 house for an undetermined period of time. . . ." (Ex. 112 at 5.)  He also wrote to Pauline that he

11 did not "know what Shannon wants for the long term." (Id. at 2.)  The Court does not find

12 credible Brosselin's testimony these emails were entirely false and only intended to protect

13 Pauline's feelings.  They are probative of the lack of certainty as to Harless's intent and reflect

14 Brosselin's recognition of this fact.  They also show that Brosselin was still attempting to

15 maintain his relationship with Pauline after Harless arrived in France despite the fact he testified

16 that he was only in love with Harless at this time.

17      Given the parties' disputed testimony, the Court, as in Maxwell, looks to other evidence

18 that makes clear there was no shared intent.  See Maxwell, 588 F.3d at 252.  Most notably, the

19 record shows that the relationship between Harless and Brosselin was not stable and that there

20 was little stability in the home after Harless's arrival in February 2011.  Within roughly two

21 weeks of Harless's and LT's arrival, Brosselin left the home for upwards of three weeks.  Harless

22 was hardly settled with Brosselin before he up and left.  Harless's friend testified that Harless

23 was still living out of her suitcases in mid-March, 2011, and was not established in the home.

24

FINDINGS OF FACT AND CONCLUSIONS OF
LAW REGARDING APPLICATION OF HAGUE
CONVENTION- 12

1   Emails Harless sent to Brosselin during his absence suggest they were fighting and that she had

2   not "settle[d] things down in [her] own mind and heart." (Dkt. No. 17 at 61.)  During this time

3   Harless sent a postcard to Williams in Oak Harbor explaining that she longed to be with him and

4   that she was only in France for a limited time.  This is evidence that Harless was not intent on

5   staying France.  Likewise Brosselin continued to be in contact with Pauline and profess his

6   desire to be with her.  Brosselin himself avers that "Shannon began to exhibit serious emotional

7   instability very soon upon her return to France. . . ." (Dkt. No. 17 at 6.)  Instability in the home

8   is obvious from Brosselin's testimony that he called the police to intervene in a domestic dispute

9   on April 10, 2011.  And by mid-April, Brosselin discovered that Harless had been engaged in

10  sexually-oriented Skype sessions with Williams, suggesting that Harless had not severed ties to

11  the United States.  See Maxwell, 588 F.3d at 252.  All of these facts paint a picture of a

12  dysfunctional home lacking in trust where Harless exhibited no settled intent to remain in

13  France.

14         The Court does not find Brosselin's evidence of Harless's intent to remain in France

15  convincing.  Brosselin points out that Harless renewed her French business license, enrolled LT

16  in daycare, and signed up for a year-long membership at a horse center where she could use the

17  saddle she brought with her.  Harless's business license does little to convince the Court she

18  intended to remain in France.  Harless appears to have worked only intermittently in the past

19  several years and has had little success in her businesses.  She also failed to present credible

20  testimony to the Court about where she has paid taxes in the past several years.  She also testified

21  that her business allows her to work in France or the United States, as it is web-based.  The

22  renewal of the license is not sufficient to contradict the other facts showing Harless did not

23  intend to remain in France.  LT's enrollment in daycare also does not convince the Court that

24

1    Harless intended to settle in France.  LT was not enrolled in any long-term program and the

2    hours he spent are not remarkable.  Similarly, the fact Harless brought her saddle and joined the

3    horse center for a year seems more a reflection of her love of riding horses, not an intent to

4    remain in France.

5         Based on the record and testimony, the Court does not find a settled mutual intent to

6    relocate to France and change LT's habitual residence.  Whatever Brosselin might have wished,

7    Harless lacked any firm commitment to live in France indefinitely.  As Brosselin wrote in his

8    emails, Harless changed her mind frequently. Neither Harless she nor Brosselin trusted each

9    other as they both carried on relationships with other persons.  Harless lived out of her suitcase,

10   did not become settled, and the relationship was dysfunctional enough to require police

11   intervention.  It is difficult for the Court to imagine how a young child such as LT might be

12   settled in such an environment where his parents' mood swings dominated the home

13   environment.  The Court thus concludes that LT's habitual residence has not changed from

14   Washington to France because there was no mutual settled intent to move LT to France

15   indefinitely.  The Hague Convention does not therefore apply, and the Court DISMISSES the

16   action.

17   C.    Acclimatization

18        Although the Court need not reach the issue of acclimatization, it does so in order to

19   provide a complete decision on the question of habitual residence.  The Court finds that LT was

20   not acclimatized to France.

21        To satisfy a change in habitual residence, Petitioner must show not only settled intent, but

22   also that LT moved to France for "an appreciable period of time."  Holder, 392 F.3d at 1015

23   (citation omitted).  There is no specific length of time that is necessary to show an "appreciable

24

FINDINGS OF FACT AND CONCLUSIONS OF
LAW REGARDING APPLICATION OF HAGUE
CONVENTION- 14

1   period of time," but it must be "sufficient for acclimatization." <u>Mozes</u>, 239 F.3d at 1078.  "When

2   the child moves to a new country accompanied by both parents, who take steps to set up a

3   regular household together, the period need not be long."  <u>Id.</u>  However, "when circumstances

4   are such as to hinder acclimatization, even a lengthy period spent in this manner may not

5   suffice."  <u>Id.</u>  Acclimatization is not the same as acculturation.  <u>Holder</u>, 392 F.3d at 1019.  That

6   is, the child need not speak French to have become acclimatized to France.  The question is

7   "whether the children's lives have become firmly rooted in their new surroundings."  <u>Id.</u>

8           As explained above, there is little evidence that LT became acclimatized.  Soon after he

9   arrived, his father left on a three-week mission, leaving him alone with his mother.  While he had

10  his own room, it appears neither he nor his mother was settled in the home—living instead out of

11  suitcases.  Brosselin argues that because LT was enrolled in daycare, he was acclimatized.  The

12  time LT spent in daycare is not particularly lengthy and it is difficult for the Court to conclude

13  that his alone would show acclimatization.  As the Ninth Circuit has stated, the question is

14  whether the "child's relative attachments to the countries have changed to the point where

15  [ordering the child's return] would now be tantamount to taking the child out of the family and

16  social environment in which its life has developed."  <u>Mozes</u>, 239 F.3d at 1081 (internal

17  quotations and citations omitted).  The Court cannot make that conclusion based on the fact LT

18  attended daycare for two months.  The countervailing facts on the record show that Harless and

19  Brosselin provided a turbulent household where, as of April, the police were needed to intervene

20  between the two of them.  There is little to no evidence on which the Court can conclude that LT

21  has become acclimatized to France.  The roughly 75 days LT spent in France in an unstable

22  household at a very young age was not sufficient to acclimatize him to France.

23

24

FINDINGS OF FACT AND CONCLUSIONS OF
LAW REGARDING APPLICATION OF HAGUE
CONVENTION- 15

1    As an alternative basis on which to dismiss this case, the Court finds that LT was not

2  acclimatized as required to show a change in habitual residence.

3                                        **Conclusion**

4    The Court concludes that the Hague Convention does not apply, and DISMISSES this

5  action.  The parties are left to proceed in Island County to resolve the ongoing parenting needs of

6  LT.

7    The clerk is ordered to provide copies of this order to all counsel.

8    Dated this 8th day of December, 2011.

9

10

11  _____
     Marsha J. Pechman
12   United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

FINDINGS OF FACT AND CONCLUSIONS OF
LAW REGARDING APPLICATION OF HAGUE
CONVENTION- 16